[No. 71525-4. En Banc.]
Argued March 21, 2002.  Decided October 17, 2002.

LAWYERS TITLE INSURANCE CORPORATION, *Petitioner*, v. SOON J. BAIK, ET AL., *Respondents*.

538

Lance C. Dahl (of *Preston Gates & Ellis, L.L.P.*), for petitioner.

*Timothy R. Gosselin* (of *Burgess Fitzer, P.S.*); *Nancy M. Allo* (of *Law Offices of Chae & Associates*); *Ronald B. Leighton, Dianne Conway,* and *James Seely* (of *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim*); and *Howard M. Goodfriend* (of *Edwards, Sieh, Smith & Goodfriend, P.S.*), for respondents.

OWENS, J. — At issue in this case is whether the Court of Appeals properly affirmed summary dismissal of a title company's negligent misrepresentation claim against a law firm representing an estate. The Court of Appeals concluded as a matter of law that the title company could not have justifiably relied upon a letter from the law firm informing the title company that, based upon the firm's tax preparation, no estate taxes were due. Because we conclude that the reasonableness of the title company's reliance remains an issue for the trier of fact, we reverse the Court of Appeals and remand this matter for trial.

## FACTS

Jae Kon Baik, a citizen of South Korea who had arrived in the United States in June 1991 on a tourist visa, died in Oregon on October 4, 1991. At the time of his death, Baik owned substantial residential and commercial property in Washington and had been preparing to apply for permanent residency in the United States. His widow, Soon Baik, retained Anderson, Burrows & Galbraith (the Law Firm) to probate his intestate estate (the Estate), which had assets of nearly $2 million. As attorney for the Estate, Grant B. Anderson delegated work to Sang I. Chae, who was fluent in both Korean and English and whom Anderson was then supervising as a Rule 9 intern.[1]

In late October 1991, Anderson initiated probate proceedings and petitioned to have Soon Baik appointed the Estate's personal representative. Soon Baik moved to Canada a short time later. By letter of November 11, 1991, Anderson informed Soon Baik of her duties as personal representative and summarized such steps as identifying the Estate's assets, appraising them, and determining any state and federal taxes owing from the Estate.[2] In conclusion, Anderson assured Soon Baik that he would "assist [her] in each phase of the estate proceeding." Clerk's Papers (CP) at 709.

In late April 1992, Chae, while still a Rule 9 intern, selected Hyun Park, a certified public accountant who had seven years of experience but had never done an estate tax

---

[1] Anderson maintains that, after Chae passed the Washington State Bar exam in May 1992 and became an associate with the Law Firm, Chae was given sole responsibility for the Estate file, but Chae contends to the contrary that all of his work for the Estate was done under Anderson's supervision.

[2] Under the heading "FEDERAL ESTATE TAX RETURN," the letter provides as follows: "The federal estate tax laws require that the Personal Representative for an estate file the IRS [Internal Revenue Service] Form 706, Federal Estate Tax Return, if a federal estate tax is due and payable for the estate. However, in computation of the federal estate tax, only those assets of the decedent's estate exceeding the federal estate tax exemption, which is presently the sum of $600,000.00, are subject to the federal estate tax. This federal estate tax must be paid within nine months from the decedent's date of death. *If it is determined that the IRS Form 706 is required for this estate, this office will assist you in the preparation and filing of the Federal Estate Tax Return.*" CP at 707-08 (emphasis added).

return, to assist with preparation of the return. In March 1992, Chae had already arranged for Soon Baik to sign a Declaration of Completion of Probate stating that "[t]he amount of State Inheritance Tax and/or Federal Estate Tax due as the result of the decedent's death has been determined, settled and paid." CP at 415, 722. Park worked on the Estate's tax return from April 21 to May 21, 1992. He had no contact with the personal representative but relied solely on Chae's information and legal analysis.

The deadline for submission of the Estate's federal tax return was July 5, 1992, nine months after Jae Kon Baik's death. Although Park had completed his work and signed the return on May 22, 1992, the Law Firm continued to work on the tax matters through mid-July 1992. Two questions central to the Estate's tax consequences were whether the decedent was classifiable as a resident and whether certain property was community property or separate. By according the decedent resident status, the Estate would qualify for a unified tax credit of approximately $192,000, instead of the credit of $13,000 applicable to nonresidents. Similarly, the property's classification as community property would reduce the size of the taxable estate. In a letter dated May 29, 1992, Chae advised Jae Kon Baik's immigration attorney, Bart Klein, that the Law Firm was "currently involved with the resolution of the estate's tax liability issue" and needed information that would support the Law Firm's claim that the decedent should be classified as a resident. CP at 754. Chae repeated the request on July 1, 1992, describing the information as necessary "in the event the IRS [Internal Revenue Service] disagrees with our tax return." CP at 755. Klein responded with an affidavit dated July 14, 1992.[3] Chae signed the Estate's federal tax return on July 17, 1992, as "of Attorneys for the Estate." CP at 761. The return, filed two weeks late, resolved the questions regarding residency status and

---

[3] As Klein's affidavit shows, at the time of Baik's death, Klein had received Baik's medical clearance and the documentation of his mother's support for his permanent residency application, but he had not filed Baik's application for permanent residency.

property characterization in the Estate's favor: the return reported that the decedent had established domicile in 1989, two years before he arrived in the United States, CP at 114, 425, 429, 430, 761, and that the decedent's property had been community property, even though it had been held in the decedent's name as "a married man as his separate property" and "a married man as his separate estate." CP at 473, 475, 765; *see also* CP at 422, 471-72. On July 20, 1992, the Law Firm presented the Declaration of Completion of Probate that Soon Baik had signed four months earlier, affirming that the death taxes had been "determined, settled and paid." CP at 722.

Before Chae received Klein's affidavit, and four days before the Law Firm filed the federal estate tax return for the Estate, Chae wrote the opinion letter to Lawyers Title Insurance Corporation (Lawyers Title) that is central to this litigation. The request for the opinion letter arose from the transfer of the Estate's residential property. In response to litigation brought against the Estate by the decedent's brother, Jae Ok Baik, Anderson negotiated a settlement in late December 1991 whereby the Estate quitclaimed the residential property to Jae Ok Baik and his wife "free and clear of any liens or encumbrances." CP at 568, 714, 1026. In June 1992, the couple sought to sell the residential property to their two sons and their sons' wives for $190,000. The children applied to a mortgage lender for a loan of $152,000, and the mortgage lender required the borrower to obtain title insurance. According to Roberta Robbins, a senior title officer at Lawyers Title, because Lawyers Title's initial review showed that the property had been formerly owned by the Estate, the preliminary commitment for the policy included an exception for estate taxes. Robbins stated that it was Lawyers Title's customary practice to remove an exception for estate taxes "upon receiving a written statement from the attorney for the estate that no estate taxes were due."[4] Aware that Anderson

---

[4] CP at 633. Lawyers Title's *Policy Writing and Exception Manual* includes the following directions: "If it is determined that a return is required, but because of

and the Law Firm represented the Estate, Robbins spoke with Chae about the exception for estate taxes and received in response the July 13, 1992, letter.

Written on the Law Firm's stationery and signed by Chae, the opinion letter reads as follows:

> This office represents the estate of Jae K. Baik and its personal representative Mrs. Baik.
>
> By this letter I am informing you that, based on our tax preparation, no estate taxes are due and owing to the state or federal government. Likewise, to my knowledge, no other taxes are outstanding against the estate.
>
> If you have any further questions, please give me a call. Please bill Mr. Baik $50.00 for my time. Thank you.

CP at 224. Chae later "surmise[d]" that, given his request that Lawyers Title "bill Mr. Baik $50.00 for [Chae's] time," Lawyers Title's request was related to "Baik's refinancing or sale." CP at 161; *see also* CP at 173. Chae also agreed that it "[w]ould . . . be a fair statement" that "informing the title company on July 13th, 1992 that no taxes were due . . . would benefit the estate," since the Estate's settlement agreement had "transfer[red] that house free and clear of all liens." CP at 162. In sum, the opinion letter satisfied the lender (who wanted a policy that included no exceptions), Lawyers Title (who wanted to accommodate its insured), and Jae Ok Baik (who could have reasonably expected the Estate's attorney to substantiate the terms of the agreement that had transferred the property to him and his wife in the first place).

In November 1992, Chae contacted Lawyers Title to obtain title insurance for the purchaser of the Estate's commercial property. Robbins surmised that Chae had apparently had the previous transaction in mind since he chose Lawyers Title, contacted her unit in particular, and closed his letter with the remark, "I am looking forward to

the marital deduction or other deductions no tax will be due, you should require a written statement to this effect from the personal representative or attorney for the estate." CP at 295.

working with you *again on this matter.*" CP at 658 (emphasis added). Robbins hired an independent firm, Exams by the LB, Inc. (Exams), to review the record. On its December 2, 1992, report, Exams made the following notation regarding estate taxes: "Declaration of Completion says taxes were paid—no release in file." CP at 661. Robbins explained that the absence of the release did not warrant excepting the estate taxes because the Declaration of Completion of Probate had been unequivocal and because Lawyers Title "had already received a representation letter from the Estate's attorney" and would not require a second one. CP at 634; *see also* CP at 183. Robbins maintains that she not only recalled Chae and the prior opinion letter but that her work on the commercial property file required her to revisit the residential property transaction.[5] In his contacts with Lawyers Title *regarding insurance for the commercial property,* Chae did not mention that, in letters to the Law Firm dated August 31 and September 9, 1992, the IRS (Internal Revenue Service) had begun "questioning the [Estate's] non-payment of estate [tax]." CP at 1007.

On July 21, 1995, having concluded its investigation, the IRS assessed taxes against the Estate of $392,733, including a penalty of $18,702 for failing to file a timely return. In 1997, the IRS levied on the real property transferred by the Estate. Covering its insureds, Lawyers Title paid the IRS $618,195.53, the total amount that the Estate owed in taxes, penalties, and interest.

Lawyers Title filed suit against the Law Firm, Anderson, and Chae.[6] Anderson cross-claimed against Chae and in

---

[5] Robbins pointed out that the preliminary commitment for the policy on the commercial property showed that the property was not in fact owned by Chae's client, the Estate, but instead was owned by Jae Ok Baik and his wife. Chae responded that the quitclaim deed from the Estate to Jae Ok Baik had erroneously included a description of the commercial property; Chae proceeded to correct the error by having Jae Ok Baik quitclaim the commercial property back to the Estate. Lawyers Title's file on the commercial property included a copy of the new quitclaim deed, dated December 7, 1992. *See* CP at 634, 675.

[6] Also named as defendants were Soon Baik and three of the estate beneficiaries, Jong Baik, Nam Baik, and Ae Kim. After Soon Baik and Jong Baik were served in Canada but failed to appear, a default judgment was entered against

1998 sought summary judgment of dismissal for himself, arguing that Chae's letter had been so ill advised that Lawyers Title could not have possibly proved that Chae had been acting under Anderson's supervision; the trial court denied that motion. In 1999, Anderson filed a second motion for summary judgment, which the Law Firm and Chae joined. The trial court granted the motion and dismissed Lawyers Title's claims against the three respondents. Lawyers Title appealed, and the Court of Appeals affirmed. *Lawyers Title Ins. Corp. v. Soon Baik*, noted at 106 Wn. App. 1049, 2001 WL 704374. This court granted Lawyers Title's petition for review.

## ISSUES

(1) Should this court conclude as a matter of law that the respondents did not supply "false information" to Lawyers Title?

(2) Should this court conclude as a matter of law that the respondents owed Lawyers Title no duty of care?

(3) Did the Court of Appeals properly conclude as a matter of law that Lawyers Title could not have justifiably relied on the respondents' letter?

## ANALYSIS

*Standard of Review*. The trial court dismissed on summary judgment Lawyers Title's negligent misrepresentation claims against the respondents. An appellate court reviews a trial court's grant of summary judgment de novo, engaging in the same inquiry as the trial court and viewing the facts and the reasonable inferences from those facts in the light most favorable to the nonmoving party. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c).

them; Nam Baik and Ae Kim were never located and served. For convenience herein, we refer collectively to the Law Firm, Anderson, and Chae as respondents.

■ *Elements of Negligent Misrepresentation.* In *ESCA Corp. v. KPMG Peat Marwick*, 135 Wn.2d 820, 826, 959 P.2d 651 (1998), this court reaffirmed its adoption of the definition of negligent misrepresentation set forth in the *Restatement (Second) of Torts*:

> "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

*Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 552(1) (1977)). Thus, to prevail on a claim of negligent misrepresentation, a plaintiff must prove by clear, cogent, and convincing evidence that he or she justifiably relied on the information that the defendant negligently supplied. *Id.* The *ESCA* court approved the trial court's jury instruction, which required the plaintiffs to prove six elements:

> "(1) That [the defendant] supplied information for the guidance of others in their business transactions that was false; and
>
> "(2) That [the defendant] knew or should have known that the information was supplied to guide [the plaintiff] in business transactions; and
>
> "(3) That [the defendant] was negligent in obtaining or communicating false information; and
>
> "(4) That [the plaintiff] relied on the false information supplied by [the defendant]; and
>
> "(5) That [the plaintiff's] reliance on the false information supplied by [the defendant] was *justified* (that is, that *reliance was reasonable under the surrounding circumstances*); and
>
> "(6) That the false information was the proximate cause of damages to [the plaintiff]."

*Id.* at 827-28 (emphasis added) (quoting CP at 1359 (Jury Instruction 17)).

In the present case, the respondents attacked elements (1), (2), and (5) above in their summary judgment motions.

They denied that Chae's opinion letter contained any misrepresentations, and they argued in the alternative that, even if the letter were deemed a misrepresentation, they had no duty of care to Lawyers Title and Lawyers Title could not have justifiably relied on the letter. The trial court's order dismissing the claim with prejudice was silent as to the grounds for dismissal, but the Court of Appeals affirmed summary judgment on element (5) alone, "hold-[ing] that reasonable minds could not differ that Lawyers Title unjustifiably relied upon the Law Firm's representations." *Lawyers Title*, 2001 WL 704374, at *2. In their answers to Lawyers Title's petition for review, the respondents reassert their additional arguments that the letter contained no misrepresentations and that the respondents owed no duty of care to Lawyers Title. This court must therefore decide whether issues of material fact remain regarding any of the three challenged elements of Lawyers Title's negligent misrepresentation claim.

*Whether Respondents Supplied False Information.* The respondents argue that Lawyers Title's negligent misrepresentation claim fails because, "[a]s a matter of law, Mr. Chae made no false representations" in his opinion letter to Lawyers Title. Suppl. Br. of Resp't at 3; *see* Resp't Anderson's Mem. in Opp'n to Pet. for Review at 13. Claiming that "[t]here is nothing inaccurate about these statements," CP at 1006, the respondents quote the second paragraph of Chae's letter:

> "By this letter I am informing you that, based on our tax preparation, no estate taxes are due and owing to the state or federal government. Likewise, to my knowledge, no other taxes are outstanding against the estate."

CP at 224, 1006. In the respondents' view, Chae was doing nothing more than accurately reporting the conclusion that Park had reached regarding the Estate's tax liability: "According to the estate tax return completed by Mr. Park nearly two months earlier, [Chae] was absolutely correct: no estate taxes were due and owing." CP at 1006-07; *see* Resp't

Anderson's Suppl. Br. at 6. In other words, Chae gave no "false information" because his essential statement—"based on our tax preparation, no estate taxes are due"—was a true statement of the Law Firm's opinion.[7]

The respondents' approach to the "false information" element of a negligent misrepresentation claim would immunize all communications that were explicitly (or even arguably) presented as opinions. Every defendant would claim that he or she had accurately and truthfully stated his or her opinion, and the content of even the most negligently obtained opinion would go unexamined: whether the opinion had been derived by tossing a coin or consulting an astrologer would be of no consequence, so long as the letter accurately stated the opinions that those methods had yielded.[8] The respondents' self-serving approach is plainly at odds with the *Restatement*'s conception of the "false information" element of a negligent misrepresentation claim. Comment a of section 552 provides that "liability . . . is based upon negligence of the actor in failing to exercise reasonable care or competence in *supplying correct information*" (emphasis added), and as section 552(1) makes clear, supplying information encompasses "*obtaining or communicating* the information." (Emphasis added.) Comment b explains that "[t]he rule . . . applies not only to information given as to the existence of facts but also to *an opinion* given upon facts equally well known to both the supplier and the recipient." (Emphasis added.) Thus, under the *Restatement*, a negligently obtained or communicated opinion will constitute "false information" for purposes of a negligent misrepresentation claim.[9]

---

[7] The respondents cannot reasonably claim that their letter is merely reporting Park's results; the letter, written on the Law Firm's letterhead, acknowledged that the Law Firm represented the Estate and that the Law Firm prepared the tax return—"based on *our* tax preparation." CP at 224 (emphasis added).

[8] Embracing this myopic interpretation of the "false information" element, the dissent looks no further than Chae's "true statements" that the Law Firm completed the Estate's tax return and found no taxes owing. Dissent at 556-57.

[9] In a number of the illustrative examples in the *Restatement*, the information at issue is an opinion: for example, in illustration 10, an accountant is hired "to

The respondents are not entitled to summary judgment on the "false information" element of the negligent misrepresentation claim. We decline to hold as a matter of law that, contrary to the *Restatement*, a negligently obtained and ultimately inaccurate opinion could not satisfy the "false information" element of a negligent misrepresentation claim.

■ *Whether Respondents Breached a Duty of Care.* The respondents maintain that when Chae sent the opinion letter to Lawyers Title, they owed the title company no duty of care. Under section 552(1) of the *Restatement*, to be liable for negligent misrepresentation, a defendant must have "supplie[d] false information" while "in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest."[10] Here, although Chae indisputably supplied the opinion letter in the course of his "profession or employment," the respondents focus instead on the alternative phrase "or in any other transaction in which he has a pecuniary interest." They quote from comment c of the *Restatement*, which explains that, where a defendant "has no pecuniary interest and the information is given purely gratuitously, he is under no duty to exercise reasonable care and competence in giving it." The respondents thus claim that Chae, who was never paid for the letter, provided the information about the estate taxes "for purely gratuitous reasons." Resp't Anderson's Mem. in Opp'n to Pet. for Review at 15.

■ ■ But the respondents stopped reading too soon. Comment d has greater applicability here:

---

furnish his opinion on the corporation's financial statements," and illustration 14 involves an accountant who "issues an unqualified favorable opinion on [a corporation's] financial statements, although it is in fact insolvent."

[10] Nothing in Washington case law supports the contention that attorneys are exempt from liability to nonclients for negligent misrepresentation. In *Hines v. Data Line Sys.*, 114 Wn.2d 127, 150, 787 P.2d 8 (1990), this court considered whether the plaintiffs had established against Perkins Coie the elements of negligent misrepresentation set forth in section 552(1). The *Restatement* does not exempt attorneys from those liable for supplying false information and uses an attorney in at least one of its accompanying comments. *See* RESTATEMENT § 552 cmt. d.

The fact that the information is given in the course of the defendant's business, profession or employment is a sufficient indication that he has a pecuniary interest in it, *even though he receives no consideration for it at the time*. It is not, however, conclusive. But when one who is engaged in a business or profession *steps entirely outside of it*, as when an attorney gives a casual and offhand opinion on a point of law to a friend whom he meets on the street, or what is commonly called a "curbstone opinion," it is not to be regarded as given in the course of his business or profession; and since he has no other interest in it, it is considered purely gratuitous.

(Emphasis added.) That Chae rendered the opinion in the course of his profession, sent it out on the Law Firm's letterhead, and assessed a $50 fee for the task all provide "a sufficient indication" that the respondents had "a pecuniary interest" in sending the letter to Lawyers Title. Moreover, Chae had certainly not "step[ped] entirely outside of" his profession to render "a 'curbstone opinion,' " nor did non-payment of the requested fee transform the letter into a "purely gratuitous" act. At the very least, the respondents acquired an indirect benefit from the letter, for as Chae acknowledged, the letter's assurance that no estate taxes were due served to reaffirm the Law Firm's prior representation to the decedent's brother that the Estate had transferred the residential property to him "free and clear of all liens." CP at 162.

In addition to contending that they had no duty to Lawyers Title because they lacked a pecuniary interest in the transaction, the respondents have also suggested that they had no duty because they lacked the necessary knowledge. In the jury instruction accepted in *ESCA*, the plaintiff was required to prove that the defendant " 'knew or should have known that the information was supplied to guide [the plaintiff] in business transactions.' " 135 Wn.2d at 827 (quoting CP at 1359 (Jury Instruction 17)); *see also Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 162, 744 P.2d 1032, 750 P.2d 254 (1987) (observing that the duty element is met "where . . . the defendant has knowledge of the specific injured party's reliance"). Here,

the respondents have no credible basis for urging this court to conclude as a matter of law that they were not "manifestly aware of the use to which the information was to be put." RESTATEMENT § 552 cmt. a.

In sum, we decline to hold as a matter of law that, for purposes of a negligent misrepresentation claim, the respondents owed no duty of care to Lawyers Title.

*Whether Lawyers Title's Reliance on the Letter Was Justifiable.* The respondents ask this court to affirm the conclusion of the Court of Appeals that, as a matter of law, Lawyers Title was not justified in relying on the Law Firm's representations. A threshold question concerning "justifiable reliance," as that term is used in section 552(1) of the *Restatement*, is whether this state has also embraced section 552A, which bars recovery for negligent misrepresentation if the plaintiff has been contributorily negligent.[11] In *ESCA*, we approached but did not reach the question of whether the contributory negligence bar of section 552A applies in Washington; in that case, because we concluded that the jury had found that the plaintiff had *not* been contributorily negligent, we left the resolution of the question for another day. In the present case, however, the question of the applicability of section 552A is before us, given that we are reviewing the propriety of the trial court's summary dismissal of a negligent misrepresentation claim.[12]

We reject the applicability of section 552A to negligent misrepresentation claims in Washington. In *ESCA*, we held that RCW 4.22.005, the uniform comparative fault

---

[11] "The recipient of a negligent misrepresentation is barred from recovery for pecuniary loss suffered in reliance upon it if he is negligent in so relying." RESTATEMENT § 552A. Paraphrasing the rule, comment a simply states that "the contributory negligence of the plaintiff in relying upon the misrepresentation will bar his recovery." *Id.* at cmt. a.

[12] The dissent's approach to the "justifiable reliance" element suffers from the same limitation found in the Court of Appeals decision. Sidestepping the applicability of section 552A to negligent misrepresentation claims in Washington, the dissent never establishes whether Lawyers Title must be a fault-free plaintiff or may maintain its claim despite having been to some degree contributorily negligent. *See* dissent at 557.

statute, applies to negligent misrepresentation claims. 135 Wn.2d at 831. In weighing that question, we observed that, "[b]y adopting comparative negligence, the harsh result of denying recovery was eliminated because the plaintiff's culpability was considered in determining total damages." *Id.* at 830. In light of our holding that comparative negligence applies to negligent misrepresentation claims, we believe that application of a contributory negligence bar to the "justifiable reliance" element would be confusing and contradictory. As we held in *ESCA*, "justifiable reliance" is properly defined for the jury as " 'reliance [that] was reasonable under the surrounding circumstances.' " *Id.* at 828 (quoting CP at 1359 (Jury Instruction 17)). We see no clear-cut way to distinguish between a plaintiff's reasonableness in relying on a misrepresentation and a plaintiff's culpability in causing his or her own damages.[13] We believe that, where a plaintiff reasonably reposes some trust in a misrepresentation and shows that that reliance proximately caused some damages, the automatic preclusion of a negligent misrepresentation claim on the grounds that the plaintiff could have done something more would be the sort of "harsh result" that the comparative fault statute sought to forestall in tort claims. *Id.* at 830. Thus, we hereby reject the applicability of section 552A to negligent misrepresentation claims and reaffirm our determinations in *ESCA* that reliance is justifiable if it is reasonable under the circumstances and that negligent misrepresentation defendants are not entitled to a jury instruction based on section 552A. *Id.* at 828.

---

[13] That applying comparative fault principles to damages necessarily means that comparative fault principles will govern the "justifiable reliance" element as well is evident in the following general comments about comparative fault and negligent misrepresentation: "The prevailing view is that comparative negligence principles are applicable to negligent misrepresentations. . . . The rationale for this view rests on the notion that there is no reason to differentiate negligent misrepresentations from any other forms of negligence, and therefore, the ordinary rules as to comparative or contributory negligence should apply. *Where the recipient of a negligent misrepresentation is negligent in relying upon the misrepresentation, this view would decrease the plaintiff's recovery to the extent of the plaintiff's own negligence in so relying.*" Sonja Larsen, Annotation, *Applicability of Comparative Negligence Doctrine to Actions Based on Negligent Misrepresentation*, 22 A.L.R.5TH 464, 471 (1994) (emphasis added).

■ Our rejection of section 552A means that Lawyers Title need not have been fault-free in its reliance on the Law Firm's letter and that the respondents' motion for summary judgment can be granted only if we are able to determine as a matter of law that Lawyers Title's reliance on the Law Firm's letter was not reasonable under the surrounding circumstances. We believe that reasonable minds could differ on that question. Robbins, the senior title officer handling the matter for Lawyers Title, stated that it was the company's customary practice to remove an exception for estate taxes "upon receiving a written statement from the attorney for the estate that no estate taxes were due," CP at 633, and Lawyers Title's *Manual* supports the contention that the company could rely upon a letter from an estate's personal representative or attorney. The letter, written on the Law Firm's letterhead, identified the Law Firm as representing the Estate and as having prepared the tax return, and the record does not establish that Lawyers Title was given any reason to doubt the Law Firm's professionalism in representing the Estate. Viewing the evidence in the light most favorable to Lawyers Title, we conclude that whether Lawyers Title's reliance on the respondents' representations was reasonable under the circumstances should remain a question of fact for the jury: a reasonable person could conclude that the title company had reasonably relied on Chae's written assurance that the Law Firm had prepared the taxes and found none owing. If the jury finds justifiable reliance, it may nevertheless reduce Lawyers Title's award proportionally upon a finding that the company was to some degree negligent in causing or increasing its own damages.

The respondents' position, adopted by the Court of Appeals, eliminates the jury's role in assessing whether Lawyers Title's reliance on the letter was reasonable under the circumstances. Urging this court to hold as a matter of law that Lawyers Title's reliance was unjustifiable, the respondents look to inapposite prior case law. For example, they turn to *Puget Sound National Bank v. McMahon,* 53 Wn.2d

51, 330 P.2d 559 (1958). There, a plaintiff brought an action for fraud, seeking rescission of a real estate contract on the grounds that the seller had misrepresented the condition of the apartment building and its revenue potential. The issue on appeal was whether the plaintiff had a right to rely on the seller's representation regarding net earnings. The trial court had found that the 81-year-old plaintiff had had " 'many, many years experience in the ownership, management and control of a considerable number of apartment houses, motels, and other rental units' " and " 'that the plaintiff was a woman of such vast business experience that upon her extensively viewing and examining the premises, it was impossible for her to have any reasonable belief that the net income from the property would be $500.00 per month.' " *Id.* at 52. This court thus concluded that these findings "could lead only to one conclusion: She was not entitled to rely upon representations as to net profits." *Id.* at 54. Similarly, the respondents cite *Williams v. Joslin*, 65 Wn.2d 696, 399 P.2d 308 (1965), wherein a real estate purchaser brought an action for fraud, contending that the seller had falsely assured him that the motel property grossed over $1,000 every two months. Reversing the trial court's judgment rescinding the contract, this court determined that, because the seller had shown the plaintiff the deposit slips (revealing a gross income of less than $400 per month), the plaintiff "had no right to rely upon any oral representation that contradicted [that evidence]." *Id.* at 698. The respondents likewise point to *Skagit State Bank v. Rasmussen*, 109 Wn.2d 377, 745 P.2d 37 (1987). In that case, a landowner raised a misrepresentation defense to a contract claim; the landowner sought rescission of loan documents based on his partner's innocent misrepresentation that the landowner's property had not been pledged as collateral. But the court determined that, because the landowner had had an opportunity to read the loan documents himself before signing them and had negligently failed to do so, the partner's misrepresentation of the legal effect of the loan documents had not made them voidable. *Id.* at 386-87. While the *Skagit State Bank* court noted that

a representee's contributory negligence was becoming a recognized defense to claims of negligent misrepresentation, the court's decision did not address the elements of negligent misrepresentation and, consequently, made no reference to section 552A. *Id.* at 386.

Plainly, *McMahon, Williams,* and *Skagit State Bank* do not address the "justifiable reliance" element of the tort of negligent misrepresentation and shed no light on Washington's adoption or rejection of the contributory negligence bar of section 552A. In any case, that Lawyers Title was not in the same position as the representees in those three opinions distinguishes those cases on their facts. In *Williams* and *Skagit State Bank,* the representees had before them, respectively, deposit slips and loan documents that unequivocally showed the falsity of the representations at issue, while in *McMahon* the plaintiff's physical inspection of the apartment building, in tandem with her vast experience in the rental business, gave her the opportunity to see the falsity of the seller's income projection for the apartments. In contrast, Lawyers Title had nothing before it that would have contradicted the written assurances of the Estate's tax attorneys. And we reject the respondents' position that, as a matter of law, Lawyers Title should have replicated the work of the Estate's tax attorneys and thereby created for itself something with which to contradict the Law Firm's representation regarding taxes; the jury may weigh the soundness of that position as it considers whether Lawyers Title's reliance on the Law Firm's letter was reasonable under the surrounding circumstances.

## CONCLUSION

We decline to conclude as a matter of law that Lawyers Title's reliance was unreasonable under the circumstances, that the Law Firm made no misrepresentations, or that the Law Firm owed Lawyers Title no duty of care. The Court of

Appeals decision affirming summary judgment is reversed, and this matter is remanded for trial.

ALEXANDER, C.J., and SMITH, IRELAND, BRIDGE, and CHAMBERS, JJ., concur.

SANDERS, J. (dissenting) — The majority rejects the Court of Appeals conclusion that Lawyers Title Insurance Corporation's reliance on the Anderson, Burrows & Galbraith's (the law firm) alleged misrepresentation was unjustified as a matter of law. Majority at 552. But I find no misrepresentation.

Lawyers Title has no cause of action for negligent misrepresentation because the law firm made no false statements. In a claim for negligent misrepresentation the plaintiff must prove the defendant made a false statement by clear, cogent, and convincing evidence. *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 97, 993 P.2d 259 (2000). Here Lawyers Title bases its claim on a letter dated July 13, 1992, from defendant Chae to Lawyers Title responding to an inquiry from Lawyers Title, asking whether the Baik estate owed any outstanding taxes on the property in question. Clerk's Papers (CP) at 631 (Decl. of Sang Chae); CP at 633 (Decl. of Roberta Robbins). That reply states in relevant part:

> By this letter I am informing you that, based on our tax preparation, no estate taxes are due and owing to the state or federal government. Likewise, to my knowledge, no other taxes are outstanding against the estate.

CP at 224.

Without dispute these representations are literally true. Lawyers Title does not claim Chae failed to prepare his client's taxes or that according to that tax preparation, taxes were due. Instead, it claims Chae was negligent in the *preparation* of his client's taxes with the result that the Baik estate subsequently owed money to the Internal Revenue Service (IRS) for underpayment of taxes. However, this assertion has no basis in a claim of negligent misrep-

resentation. Chae made *no representation* that the Baik estate had received a certificate of release from the IRS and offered *no opinion* about the likelihood of an audit. Lawyers Title's claim for negligent misrepresentation is unsustainable because a plaintiff cannot base a negligent misrepresentation claim on statements a defendant did not make, *Trimble*, 140 Wn.2d at 98, or on truthful statements it did make.

In *Trimble* we upheld a summary judgment dismissing the plaintiff's negligent misrepresentation claim where he alleged the defendant university had failed to inform him that its offer of tenure consideration after three years, instead of the usual six, would present a serious handicap to obtaining tenure. *Id.* at 97-98. The court held:

> The record shows *no representation* to Trimble about how tenure review after three years, as opposed to six, would play out and there is no evidence that WSU [Washington State University] misled Trimble on this matter. Thus, there was *no "false information"* supplied to Trimble. Merely not discussing the downsides of various terms of employment in employment negotiations *will not create a cause of action for negligent misrepresentation.*

*Id.* (emphasis added). This is precisely the situation here. Chae made *no representation* about the tax return prepared, beyond the fact the return indicated no taxes were due. This was precisely the information sought by Lawyers Title and precisely the information it received.

The majority overlooks this issue, concluding, "We decline to hold as a matter of law that, contrary to the *Restatement [(Second) of Torts]*, a negligently obtained and ultimately inaccurate opinion could not satisfy the 'false information' element of a negligent misrepresentation claim." Majority at 548. It makes no sense to say the information contained in the letter was "obtained negligently" or was "inaccurate." Chae spoke from personal experience that the law firm had completed the tax return for the Baik estate and he had found no taxes due—both true statements. The majority concerns itself not with the

truth of the law firm's actual representations—the first prong of the test of negligent misrepresentation—but with the wholly distinct allegation regarding alleged negligence in preparing the tax return. But this is an underwriting risk Lawyers Title assumed. It may well have been more cost effective to gamble the law firm was right than to independently audit the tax return, or risk losing business by failing to insure against that contingency. That is the nature of the insurance business.

By conflating the truth of the statements which form the basis of Lawyers Title's claim for negligent misrepresentation with the latter's allegations of incompetency, the majority allows Lawyers Title to bring a contribution claim in the guise of a negligent misrepresentation claim. Because such considerations have no place in a claim for negligent misrepresentation, I would affirm the trial court's order granting defendants' motion for summary judgment.

Additionally, even if Chae's letter could be construed as a misrepresentation of the law firm's competency in the preparation of its client's tax return, the Court of Appeals correctly concluded Lawyers Title was not justified to rely on it for that purpose. *Lawyers Title*, 2001 WL 704374, at **2-4. Discussing this prong of the negligent misrepresentation claim, the majority makes much of its rejection of section 552A of the *Restatement (Second) of Torts*, a provision which is not even discussed by the Court of Appeals, while summarily dismissing the authorities upon which the Court of Appeals actually relied because it makes "no reference to section 552A." Majority at 554.

The majority claims it must address the applicability of section 552A because "we are reviewing the propriety of the trial court's summary dismissal of a negligent misrepresentation claim." Majority at 550. However, section 552A has no application here because Lawyers Title is not entitled to rely on Chae's alleged misrepresentation *as a matter of law*.

As the Court of Appeals held, even if there were a misrepresentation Lawyers Title's claim must fail by reason of

two established principles of Washington law. First, where a party is peculiarly qualified, by experience and expert knowledge, to evaluate the truth or falsity of a representation, the party has *no right* to rely on such statements. *Beckendorf v. Beckendorf*, 76 Wn.2d 457, 464, 457 P.2d 603 (1969). As the Court of Appeals stated, a title insurance company has considerable expertise in the evaluation of the status of titles. *Lawyers Title*, 2001 WL 704374, at \*3 (citing *Lawyers Title Ins. Corp. v. D.S.C. of Newark Enters., Inc.*, 544 So. 2d 1070, 1072 (Fla. Dist. Ct. App. 1989)). When Lawyers Title deletes an exception based on its anticipation no taxes are due, it accepts an underwriting risk that taxes are not as inevitable as death.

Inexplicably, the majority holds Lawyers Title may be entitled to rely on Chae's letter because Lawyers Title's own internal procedures allow title officers to remove an exception for estate taxes when they are in possession of a letter from an estate's personal representative or attorney stating that no taxes are due. Majority at 552. Lawyers Title may properly view such a letter as indicative of a reduced risk, but not as a guaranty. The fact that its guidelines authorize such reliance does not alter the law. *Cf. Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 911, 784 P.2d 507 (1990) ("[W]here an insured took a calculated business risk that pollution from a sewage plant would contaminate nearby property, we have held that the insured could not look to its insurer to indemnify it for its liability resulting from its failure to prevent the event.").

Second, the " 'right to rely on representations is inseparably connected with the correlative problem of the duty of a representee to use diligence in respect of representations made to him.' " *Skagit State Bank v. Rasmussen*, 109 Wn.2d 377, 384, 745 P.2d 37 (1987) (quoting *Williams v. Joslin*, 65 Wn.2d 696, 698, 399 P.2d 308 (1965)). As a title insurance company, Lawyers Title has an independent duty " 'to make a thorough and competent search of the record title.' "

*Lawyers Title*, 2001 WL 704374, at \*3 (quoting *D.S.C. of Newark Enters.*, 544 So. 2d at 1072); *see also Williams*, 65 Wn.2d at 698 (reversing a judgment for rescission of contract based on fraud when the plaintiff failed to show any interest in the records that might have contradicted defendants' representations). Its "right to rely on a representation is inseparably linked to its duty to use diligence in interpreting representations made to it." *Id.*, 2001 WL 704374, at \*3 (citing *Puget Sound Nat'l Bank v. McMahon*, 53 Wn.2d 51, 52, 330 P.2d 559 (1958)). Lawyers Title is in a position to know lawyers cannot and do not guarantee their view of tax liability will ultimately and necessarily prevail in court.

Lawyers Title's own guidelines warn of the potential risk attached to properties conveyed as part of an estate:

> Any estate tax that is due constitutes a lien at the date of the decedent's death. Except to the extent that the title insurer is aware of the death, the tax is essentially a hidden lien, there being (in most instances) no recording requirement.

CP at 825 (*Lawyers Title Insurance Corporation Underwriting Manual*). In the event the company is to insure a title to a property that had been conveyed pursuant to an estate distribution, the agent is first required to determine the approximate size of the estate to determine whether a tax return is required. *Id.* Nothing in the record indicates Lawyers Title complied with its own requirement. Further, the guidelines suggest various precautions an agent should take including, but not limited to, obtaining a written statement from the personal representative or the attorney for the estate:

> In any doubtful case, you should except to the potential estate tax lien or require a bond from a corporate surety or a sum to be held in escrow for an amount sufficient to employ an attorney to file the return and satisfy any potential estate tax liability.

*Id.* Lawyers Title knew or ought to have known that federal estate tax constituted a lien on the decedent's property

until the IRS issued a closing letter or the three-year statute of limitations had run. *See* CP at 825. It knew the estate had not received a release from the IRS for federal tax liability. CP at 964. Yet it removed the federal estate tax exception nine months after Mr. Baik died intestate without requiring a bond, without a release from the IRS, and without reviewing the tax return for the Baik estate. Thus, Lawyers Title assumed a known risk when it speculated there would be no ultimate tax assessment and clearly abdicated its duty to use diligence to interpret representations made to it. *Skagit State Bank,* 109 Wn.2d at 384.

Relying on clearly established Washington precedent, the Court of Appeals properly concluded that Lawyers Title's reliance on Chae's letter as a guaranty of no ultimate tax liability was not justified because it "failed to comply with its own guidelines by either excepting liability for estate taxes or procuring an indemnification bond, and failed to fulfill its independent duty to investigate." *Lawyers Title,* 2001 WL 704374, at \*3. This decision is consistent with the principle that a party taking a calculated business risk must accept the cost associated with such risks. *Boeing,* 113 Wn.2d at 911.

Finally, the majority rejects the approach adopted by the Court of Appeals because it "eliminates the jury's role in assessing whether Lawyers Title's reliance on the letter was reasonable under the circumstances." Majority at 552. However, summary judgment is proper if after the motion is made the nonmoving party fails to establish any facts which would support an essential element of its claim. *Young v. Key Pharms., Inc.,* 112 Wn.2d 216, 225, 770 P.2d 182 (1989).

Where a plaintiff fails to use diligence to interpret representations made to it, the plaintiff's fraud claim fails as a matter of law. For example, in *McMahon,* we affirmed the trial court's dismissal of the plaintiff's action for contract rescission based on fraud, holding as a matter of law that because of the plaintiff's business experience, she "was not

entitled to rely upon [the defendant's] representations." *McMahon*, 53 Wn.2d at 54. Similarly, in *Williams* we reversed a judgment of the trial court rescinding the contract based on fraud, when all the evidence pointed to the plaintiff's complete lack of interest in reviewing the underlying records:

> Since the evidence of the actual receipts was before the respondent, he had no right to rely upon any oral representation that contradicted it.

65 Wn.2d at 698. Finally, in *Skagit State Bank*, we reversed a trial court judgment, voiding the plaintiff's mortgage and loan agreement on the basis of an innocent misrepresentation, when the plaintiff had not read documents he signed:

> "a party whose rights rest upon a written instrument which is plain and unambiguous, and who has read or had the opportunity to read the instrument, cannot claim to have been misled concerning its contents or to be ignorant of what is provided therein."

109 Wn.2d at 381 (quoting *Johnston v. Spokane & I.E.R.R.*, 104 Wash. 562, 569-70, 177 P. 810 (1919)).

The majority "reject[s] the respondents' position that, as a matter of law, Lawyers Title should have replicated the work of the Estate's tax attorneys and thereby created for itself something with which to contradict the Law Firm's representation regarding taxes." Majority at 554. However, that is precisely what our law requires. Because the majority's opinion represents a radical departure from established legal principles, not justified on the facts of the case, I would affirm the Court of Appeals opinion as an alternative ground to uphold the trial court's decision.

JOHNSON and MADSEN, JJ., concur with SANDERS, J.